U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2019 JUN 11 PM 2: 18

CLERK
BY  LAW
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 2:17-cr-00083 |
| ) | |
| DEAN SHORES ) | |

**OPINION AND ORDER
DENYING DEFENDANT'S MOTION TO SUPPRESS**
(Doc. 58)

Defendant Dean Shores is charged in a two-count Indictment with knowingly and intentionally possessing with intent to distribute fifty or more grams of methamphetamine, and knowingly and intentionally possessing with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(B). Pending before the court is Defendant's motion to suppress the statements he made following his arrest. (Doc. 58.) The government opposes the motion. On May 10, 2019, the court held an evidentiary hearing at which Burlington Police Department ("BPD") Task Force Officer ("TFO") Dwayne Mellis and Emily Furman[1] testified.

Defendant is represented by Heather E. Ross, Esq. and Michael J. Leddy, Esq. The government is represented by Assistant United States Attorneys Jonathan Ophardt and Andrew C. Gilman.

**I.  Findings of Fact.**

Since January of 2009, TFO Mellis has worked for BPD and has been assigned to the Drug Enforcement Administration ("DEA") since July of 2015. As a TFO, he investigates illegal narcotics possession and distribution and related crimes, including money laundering and human trafficking. Prior to joining BPD's narcotics unit, he was a member of its street crimes unit. In May of 2017, he was a detective corporal in BPD's narcotics unit.

---

[1] Ms. Furman is Defendant's mental health counselor at the Essex County Correctional Facility where he has been detained pending trial.

On or about May 4, 2017, a confidential informant ("CI") reported to BPD Officer Ethan Czyzewski that a man the CI knew as "Dean" was selling blue pills believed to be oxycodone. TFO Mellis and Officer Czyzewski agreed to recommend leniency for the CI on two pending drug charges in exchange for the CI's assistance with a controlled purchase from Dean. Thereafter, the CI negotiated a purchase of 500 "blue pills" from Dean for which law enforcement provided the $3,750 purchase price.

Prior to the controlled buy, the CI was searched and outfitted with a transmitting device. He was then escorted to 150 West Canal Street, suite number two, where Dean owned a business. Law enforcement surveilled the area and watched the CI enter the business. After approximately fifteen minutes, the CI exited and was escorted to a predetermined location to meet with Officer Czyzewski and TFO Mellis where the CI turned over 496 blue pills. The CI was searched, and no other contraband was found. Laboratory testing subsequently revealed the blue pills contained fentanyl. The CI identified the man he knew as Dean from a photograph and confirmed he had engaged in the controlled purchase with him. Law enforcement determined that Defendant was Dean and that his driver's license was criminally suspended.

Following the controlled purchase, in the early morning hours of May 5, 2017, law enforcement officers who were surveilling the area observed Defendant leaving the business at 150 West Canal Street in a vehicle which he drove to the downtown area of Winooski where he was stopped by law enforcement and arrested. During a search incident to arrest, law enforcement officers found on Defendant's person United States currency used in the controlled buy, Adderall pills, and approximately thirty-one grams of a substance suspected to be methamphetamine. Laboratory testing subsequently confirmed the substance contained methamphetamine. Defendant was transported to the BPD and placed in a holding cell.

At approximately 2:27 a.m., TFO Mellis and Officer Czyzewski began interviewing the Defendant. Officer Czyzewski read Defendant his *Miranda* rights as follows:

2

Officer Czyzewski: Okay, alright, so all I need you to do is "yes" or "no" and if you need me to explain something, feel free to ask and, and I'll explain anything else. Okay?

Defendant: Yep.

Officer Czyzewski: Alright. Um, you have the right to remain silent. Do you understand?

Defendant: Yes, I do.

Officer Czyzewski: Anything you say can be used against you in a court of law. Do you understand?

Defendant: I do.

Officer Czyzewski: Yes?

Defendant: Yes sir, sorry.

Officer Czyzewski: You have the right to be represented and talk to a lawyer before questioning and to have a lawyer present with you during questioning. Do you understand?

Defendant: Yes sir.

Officer Czyzewski: If you cannot afford to hire a lawyer, one will be appointed to represent you at public expense before any questioning, if you wish. In Vermont this is called a public defender. Do you understand?

Defendant: Yes sir.

Officer Czyzewski: If you decide to answer questions, you may stop the questioning at any time. Do you understand?

Defendant: Yes sir.

Officer Czyzewski: Do you understand each of these rights I have explained to you?

Defendant: I do, sir.

Officer Czyzewski: Do you want to be represented by a lawyer or have one present with you during questioning?

Defendant: Is that what we're doing next?

Officer Czyzewski: So right now, I'd like to—to talk to you and ask you some questions. Um, if you'd like a lawyer present with you during those questions that I ask you right now, um, that's your right, but if that's the case, then I—I'm not going to ask you any questions, we're going to put you in the cell, finish my paperwork, and bring you down to jail.

Defendant: Mmhmm.

Officer Czyzewski: Uh, if you want to talk to me now, that's up to you, that's a hundred percent your right, I—I can't force you, I can't twist your arm, can't do anything like that, that's just a decision that you're going to have to make on your own, whether or not you want to answer these questions or not. Um[.]

Defendant: Either way I'm being brought to jail.

Officer Czyzewski: What's that?

Defendant: Either way I'm being brought to jail.

Officer Czyzewski: That's not the case.

Defendant: I'm sorry?

Officer Czyzewski: That's not, you know, we can kinda decide if you go to jail tonight, or if you go home tonight.

Defendant: You serious?

Officer Czyzewski: A hundred percent. So, I—I'm not going to, I'm not going to bullshit you at all, from you know—I expect you to be honest with me, and I—I'm not going to sit here and lie to somebody if I'm asking them to sit there and to be straight with me. So,

Defendant: I'm not going to lie to you, I promise that.

Officer Czyzewski: Okay, and I'm not going to lie to you, either.

Defendant: I don't like liars.

TFO Mellis: Nope, appreciate that.

Officer Czyzewski: Nope, me neither.

Defendant: I just won't answer.

Officer Czyzewski: So, so I'll ask you again. Do you want to be represented by a lawyer, or have one present with you during questioning?

Defendant: Are you serious?

Officer Czyzewski: I'm a hundred percent serious.

TFO Mellis: And, and do take into account, he also, the section that's read, that if you do decide to answer questions, you can stop the questioning at any time.

Officer Czyzewski: You can pick and choose what questions you answer.

Defendant: Oh man, yeah [inaudible].

Officer Czyzewski: Okay, so I'll ask you again just for clarification. Do you want to be represented by a lawyer, or have one present with you during questioning?

Defendant: No sir.

(Gov. Ex. 2, 4:17-8:01.)

Officer Czyzewski provided Defendant a written copy of his *Miranda* rights, which included a waiver form, and confirmed that Defendant could read. Defendant advised that he was familiar with the *Miranda* process based on his three years of employment at a sheriff's department. Defendant read the *Miranda* form and signed a *Miranda* waiver which stated:

> I have been advised of my rights and understand them. No threats or promises have been made to me. I understand that I am waiving my right to be represented by a lawyer, to talk with a lawyer before questioning and to have a lawyer present during questioning. Knowing my rights I agree to waive them and talk with you now.

(Gov. Ex. 4, at 004709.)

Thereafter, Defendant was interviewed by Officer Czyzewski and TFO Mellis, as well as by DEA agents and other BPD officers. The interview lasted approximately nine hours with several breaks of unspecified duration, including periods during which Defendant was permitted to sit with his dog in BPD's holding cell.[2] Defendant advised that he was a daily user of methamphetamine and had not slept the night before because he had been up working. He mentioned that he suffered from depression, but he did not mention post-traumatic stress disorder ("PTSD").

Approximately thirty minutes into the interview, Defendant again raised the issue of whether he would be released:

> Defendant: I, I'm comfortable talking to you guys, but I know what your job is, you're supposed to get comfortable with me and you're doing good, but I gotta tell you, I just had a fucking chill go up my spine because, I'm just shooting the shit here, like I'm talking to a friend, and the only reason is because you're telling me that I can go home tonight, and, and, I don't really, I gotta be honest, I don't believe you.
>
> TFO Mellis: Let me explain something. Again, we can't make you promises.
>
> Defendant: Okay.
>
> TFO Mellis: That would be wrong of us to do that, then we'd be lying.

---

[2] Defendant's dog was with him when he was arrested and TFO Mellis credibly testified that they allowed Defendant to remain with his dog during breaks because it made Defendant feel more comfortable.

5

Defendant: But you've been watching me. You know what the fuck I've been doing.

TFO Mellis: But this is the thing though. This is the thing, like, like we said Dean, we have to appease our bosses, and present them with something that's viable.

Defendant: Like what? Like, I mean, tell me.

Officer Czyzewski: I think we're headed there.

TFO Mellis: We're headed there. That's, that's what I'm getting at. Okay. But I need to . . .

Defendant: I'm sitting here talking about cartels and shit, you know. I mean [inaudible] my guys from Boston is [inaudible] there's fucking three people been gone this year because of shit like this.

TFO Mellis: Well, well, I know you're talking about cartels but we're not even there yet. We just, we just . . .

Defendant: If, if I keep talking, we're there. You know.

TFO Mellis: Well, well, listen again we have to go back and tell our bosses like, hey this dude's legit and we want you know what I'm saying, consideration in regards to everything. Okay?

Defendant: But what are you going to want from me?

TFO Mellis: I want to hear your story bro. That's, that's where I'm curious about your story.

(Gov. Ex. 2, 29:35-31:41.)

During the interview, Defendant consented to a search of his business at 150 West Canal Street, suite number 2 and was transported there by BPD officers, arriving at approximately 4:40 a.m. Defendant agreed to point out the locations where narcotics would be found and to hand them over to the law enforcement officers rather than have a search that might disorganize his office. In the course of the search, Defendant opened a number of locked doors, each of which required a separate code.

From the office closet, with Defendant's assistance, TFO Mellis seized Xanax and Adderall pills contained in a wall safe, and a Nature's Best container of Xanax pills. Defendant informed TFO Mellis that blue pills were stored in a paint can with a false bottom. When TFO Mellis informed Defendant that the paint can was not in the closet, Defendant indicated it must be in the floor safe. Defendant then pulled up the carpet,

6

opened the floor safe with a code, and handed law enforcement officers the paint can which contained approximately 2,700 blue pills. Laboratory testing later revealed the blue pills contained fentanyl. At the time of the consent search, Defendant did not empty the floor safe, advising the law enforcement officers that the remaining contents consisted of personal items such as a thong and sex toys.

After the consent search, Defendant was transported to BPD where the interview resumed. During breaks, Defendant was again placed in a holding cell with his dog, provided with coffee, and given access to a bathroom. TFO Mellis credibly testified that Defendant was coherent and was not "rambling" in his speech. When questioned about Defendant's demeanor, TFO Mellis responded that Defendant "appeared okay" although, because Defendant reported being a daily methamphetamine user, TFO Mellis agreed it would be fair to assume Defendant was under the influence at the time of the interview. TFO Mellis further credibly testified that Defendant did not lose focus, did not appear to hallucinate or appear disconnected with reality, was alert, and appeared to understand the questions posed to him.

BPD informed the DEA of Defendant's arrest, and DEA agents arrived between 8:45 a.m. and 9:00 a.m. on the morning of May 5, 2017 to interview Defendant for approximately four hours. That afternoon, TFO Mellis and other BPD officers applied for and received state search warrants for Defendant's business, residence, and vehicle. Defendant accompanied law enforcement officers to execute the search warrants because he did not want to arouse the suspicions of individuals renting space next to his business. Defendant and one law enforcement officer entered his business, Defendant opened the floor safe, and retrieved approximately 230 grams of methamphetamine, $48,000 cash, and a fraudulent New York state driver's license. After the search warrants were executed, Defendant was released from custody on the afternoon of May 5, 2017.

Defendant's expert witness, Ms. Furman, opined that Defendant suffers from PTSD arising out of his arrest on Cape Cod when he was working for a sheriff's office and his estranged wife was pursuing a restraining order against him. Because his stepfather had been a law enforcement officer who was physically abusive to Defendant

7

and his mother, she further opined that interactions with law enforcement are triggering events for Defendant's PTSD. Ms. Furman testified that she believes Defendant was highly vulnerable to law enforcement's investigative tactics and would try to comply with them as a defense mechanism. She administered no objective tests to support her opinions, has never testified as an expert witness in a criminal case previously, and derived her understanding of the operative facts from Defendant's self-report and a document that showed that Defendant was acquitted of the criminal charge against him in Cape Cod.[3]

## II. Conclusions of Law and Analysis.

### A. Whether Defendant's *Miranda* Waiver was Invalid Because it was Not Knowing and Voluntary.

Defendant contends that his waiver of *Miranda* rights was coerced by law enforcement officers because they promised him that he could go home if he agreed to speak to them without an attorney and that, alternatively, if he exercised his right to counsel he would be taken to jail. He further asserts that his waiver of *Miranda* rights was not knowing and voluntary because he was under the influence of drugs, suffering from PTSD and depression, and had not slept the previous night. He seeks suppression of all of the statements he made during the interview and all physical evidence found pursuant to search warrants supported by his statements as fruit of the poisonous tree.[4]

An "accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived [*Miranda*] rights when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (alteration in original) (internal quotation marks omitted).

---

[3] As the government did not move to exclude or strike Ms. Furman's testimony, the court addresses the reliability of her testimony as an issue of weight rather than admissibility.

[4] *See United States v. Patane*, 542 U.S. 630, 634, 641-42 (2004) (holding that "the fruit of the poisonous tree doctrine" is inapplicable because "[t]he exclusion of unwarned statements . . . is a complete and sufficient remedy for any perceived *Miranda* violation" and thus "the physical fruits of the suspect's unwarned but voluntary statements" remain admissible even where a *Miranda* violation is established) (internal quotation marks omitted).

8

> Such a waiver must be voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and must be knowing[] in the sense that it was made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*United States v. O'Brien*, 2019 WL 2399228, at *10 (2d Cir. June 7, 2019) (alteration in original) (emphasis omitted) (internal quotation marks omitted).

The court evaluates the "totality of the circumstances" to determine whether Defendant's *Miranda* waiver is valid. *See Moran v. Burbine*, 475 U.S. 412, 421 (1986) ("Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.") (internal quotation marks omitted). The Second Circuit has recently observed that "full comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process." *O'Brien*, 2019 WL 2399228, at *10 (alteration in original) (citation omitted). As a result, a defendant's signing of "an express 'waiver-of-rights' form before making the inculpatory statements in question . . . alone, is enough to strongly support the finding that [the defendant], 'who could read and write,' and expressed his familiarity with his rights, knowingly and freely waived those rights before speaking." *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011) (citation omitted); *see also United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) ("In general, a suspect who reads, acknowledges, and signs an 'advice of rights' form before making a statement has knowingly and voluntarily waived *Miranda* rights.").

Before the interview began, Officer Czyzewski read Defendant his *Miranda* rights and Defendant verbally affirmed that he understood them. Defendant then read the *Miranda* rights himself and signed the *Miranda* waiver. In doing so, he acknowledged his familiarity with *Miranda* based on his prior law enforcement experience. *See United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) (holding that a defendant's "familiar[ity] with police questioning" was a factor that weighed in favor of finding that his statements were voluntary). Defendant's express, signed *Miranda* waiver "strongly

9

support[s] the finding that [Defendant] . . . knowingly and freely waived [his *Miranda*] rights before speaking." *Plugh*, 648 F.3d at 127.

Although Defendant contends that his *Miranda* waiver was not voluntary because he was presented with the choice of either waiving his rights or going to jail, no reasonable interpretation of the agents' statements supports this characterization. The agents truthfully told Defendant that if he asked for a lawyer, he would not be questioned further, and he would be transported to jail. The agents stressed that the decision whether to invoke his *Miranda* rights was "a hundred percent [his] right" and "just a decision [he was] going to have to make on [his] own[.]" (Gov. Ex. 2 at 4:14-8:01.) When Defendant sought to clarify whether he was going to jail either way, the agents truthfully stated they could "kinda decide" if he went to jail that night or went home. *Id.* This, in fact, proved accurate as Defendant was released after questioning.

Defendant's assertion that his *Miranda* waiver was analogous to the one found involuntary in *Taylor* because he was tired and a daily user of methamphetamine is unavailing as the circumstances of Defendant's interview are easily distinguishable. In *Taylor*, the defendant repeatedly fell asleep during his interview with law enforcement and had to be roused on multiple occasions because, prior to the interview, he had consumed an entire bottle of Valium. *Taylor*, 745 F.3d at 24. In contrast, Defendant was stopped after a controlled buy while he was driving his vehicle in a downtown area thereby supporting a conclusion that he had an adequate level of functioning prior to his arrest. Thereafter, Defendant was able to answer questions from law enforcement officers and his answers were rational and coherent. He accompanied law enforcement on two searches of his place of business without apparent difficulty. He manifested a clear understanding of his *Miranda* rights, the seriousness of his situation, and the consequences of his incriminating statements. *See O'Brien*, 2019 WL 2399228, at *11 (affirming *Miranda* waiver based on, among other things, "the agents' testimony that [defendant] was alert, focused, and never evinced any difficult understanding the agents or communicating with them, and that he said he understood those rights when they were read to him" despite defendant's testimony to the contrary).

Based on the totality of the circumstances, the government has proved by a preponderance of the evidence "that the defendant relinquished his rights voluntarily with a full awareness of the rights being waived and the consequence of doing so." *United States v. Gaines*, 295 F.3d 293, 297 (2d Cir. 2002).

### B.     Whether Defendant's Confession was Involuntary.

"[W]hen a confession challenged as involuntary is sought to be used against a criminal defendant at his trial, he is entitled to a reliable and clear-cut determination that the confession was in fact voluntarily rendered." *United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010) (quoting *Lego v. Twomey*, 404 U.S. 477, 489 (1972)). The Supreme Court has held that "the voluntariness of a statement" depends on whether "the defendant's will was overborne" by police coercion. *Yarborough v. Alvarado*, 541 U.S. 652, 667-68 (2004) (quoting *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963)). "[C]oercive police activity" is therefore "a necessary predicate to the finding that a confession is not 'voluntary[.]'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Factors to be considered in determining whether a confession was knowing and voluntary include: (1) "the accused's characteristics," (2) "the conditions of interrogation," and (3) "the conduct of law enforcement officials." *Taylor*, 745 F.3d at 24 (quoting *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)); *see also United States v. Kaba*, 999 F.2d 47, 51 (2d Cir. 1993) (stating that courts "look at the totality of the circumstances . . . to determine whether the government agents' conduct was such as to overbear [a defendant's] will to resist and bring about confessions not freely self-determined.") (internal quotation marks omitted); *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988) ("No single criterion controls whether an accused's confession is voluntary[.]").

The defendant's "mental state" is considered only "to the extent it allowed law enforcement to coerce the individual." *Taylor*, 745 F.3d at 24; *see also Connelly*, 479 U.S. at 165 ("[W]hile mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry"). The "most critical circumstance . . . is the law

11

enforcement officers' conduct." *Green*, 850 F.2d at 902. Relevant considerations in determining whether the police conduct was coercive include:

> [T]he repeated and prolonged nature of the questioning or the failure to inform the accused of his constitutional rights; whether there was physical mistreatment such as beatings; or long restraint in handcuffs, and whether other physical deprivations occurred such as depriving an accused of food, water or sleep; or even of clothing, for a prolonged period. In addition . . . police conduct might include psychologically coercive techniques such as brainwashing or promises of leniency or other benefits.

*Id.* (citations omitted). "It is difficult to determine whether a confession is voluntary; case law 'yield[s] no talismanic definition' for the term." *Taylor*, 745 F.3d at 24 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973)).

"Material misrepresentations based on unfulfillable or other improper promises might perhaps overbear a defendant's will[,]" however, "statements to the effect that it would be to a suspect's benefit to cooperate are not improperly coercive." *Ruggles*, 70 F.3d at 265. "A court will not, however, readily imply an improper promise or misrepresentation from vague or ambiguous statements by law enforcement officers. This is particularly so with respect to promises of leniency." *United States v. Haak*, 884 F.3d 400, 410 (2d Cir. 2018); *see also United States v. Guarno*, 819 F.2d 28, 31 (2d Cir. 1987) ("[A] confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials."); *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (holding that "promises of leniency do not per se render a confession involuntary").

Here, Defendant was advised of his *Miranda* rights, waived them, and affirmatively told law enforcement he did not want an attorney present during questioning. He then sought to cooperate with law enforcement's investigation to the extent it appeared beneficial for him to do so. Law enforcement reminded Defendant that it was entirely his decision whether to cooperate and made no concrete and unequivocal offers of leniency if he did so. At the time, one of the benefits that Defendant sought to obtain was to go home after the interview. Although he appeared motivated to cooperate to achieve this outcome, law enforcement did not coerce this decision. *See United States*

12

*v. Salameh*, 152 F.3d 88, 117 (2d Cir. 1998) (stating a court need not "divine a defendant's motivation for speaking or acting" if there is "no [plausible] claim that governmental conduct coerced his decision.") (internal quotation marks omitted).

Officer Czyzewski's statement that he and TFO Mellis could "kinda decide" whether the Defendant went home was neither coercive nor untruthful. It was a "vague description of the potential benefits of cooperation" and "contained no material misrepresentations or unfulfillable promises[,]" *Gaines*, 295 F.3d at 299, as Defendant was in fact released at the conclusion of his interview.

TFO Mellis credibly described Defendant as calm, cooperative, and coherent during an interview that was friendly and conversational in tone as Defendant himself acknowledged.[5] *See United States v. Siddiqui*, 699 F.3d 690, 706-07 (2d Cir. 2012) (holding confession for hospitalized defendant in restraints was voluntary because she was "coherent, lucid, and able to carry on a conversation" and the agents' conduct towards the defendant "was not overbearing or abusive"). Although Defendant was interviewed for a significant period of time while he was allegedly under the influence of methamphetamine and without sleep, he was provided breaks, coffee, access to a bathroom, and time in the holding cell with his dog, as well as trips outside accompanied by law enforcement to his place of business. *See Green*, 850 F.2d at 903 (finding no coercion where defendant "was not handcuffed at any time during the interrogation. Following it he was allowed to use the bathroom and was furnished with food, drink, and cigarettes."). Defendant was not physically mistreated or threatened or subjected to a display or threat of force. His cooperation was not immediate and complete; rather, it was phased and strategic.[6]

---

[5] *See, e.g.*, Gov. Ex. 2, 29:35-31:41 ("I'm comfortable talking to you guys . . . I'm just shooting the shit here, like I'm talking with a friend[.]").

[6] For example, Defendant sought to limit law enforcement's access to incriminating evidence by suggesting he point out where evidence would be found. He then lied about the remaining contents of the floor safe until it was inevitable that its full contents would be seized by law enforcement. Contrary to Ms. Furman's prediction as to how Defendant's PTSD would affect his behavior, he did not immediately capitulate to law enforcement as a defense mechanism.

13

Because the government has proven by a preponderance of the evidence that Defendant's confession was voluntary, Defendant's motion to suppress his confession is DENIED.

## CONCLUSION

For the reasons stated above, Defendant's motion to suppress is DENIED. (Doc. 58.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 11th day of June, 2019.

Christina Reiss, District Judge
United States District Court