UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

United States of America

v.                                              Crim. Action No. 2:17–cr–83–cr

Dean Shores

## <u>ORDER[1] AND REPORT AND RECOMMENDATION</u>
(Docs. 121, 138)

Defendant Dean Shores, proceeding *pro se*, has filed a Motion, as amended, Under

28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence.  (Docs. 121, 138.)  On August 27,

2019, Shores pleaded guilty to conspiracy to distribute 50 grams or more of methamphetamine,

fentanyl, gamma hydroxybutyric acid (GHB), and Ketamine.  (PSR at 4, ¶¶ 6–7.)  On January

21, 2020, United States District Judge Christina Reiss sentenced Shores to 120 months in prison

and a 5-year term of supervised release.  (Doc. 112.)  Shores principally asserts that as a result of

ineffective assistance of counsel, he was denied his rights under the Speedy Trial Act and the

Interstate Agreement on Detainers (IAD)  Contending that the alleged ineffective assistance of

counsel resulted in an excessive term of imprisonment, Shores requests that the Court vacate his

---

[1] Shores filed a Motion to Amend his § 2255 Motion on July 19, 2021.  (Doc. 138.)  "[An] Application for a writ of habeas corpus . . . may be amended or supplemented as provided in the rules of procedure applicable to civil actions."  28 U.S.C. § 2242; *Ching v. United States*, 298 F.3d 174, 180 (2d Cir. 2002).  Courts are instructed to "freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  While the decision to grant leave to amend "is within the discretion of the District Court," leave should be freely granted "[i]n the absence of any apparent or declared reason."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Shores explains that Covid-related restrictions on access to the prison law library prevented him from sufficiently researching the claims for inclusion in the initial habeas Motion.  (Doc. 138 at 1.)  The government did not oppose Shores's Motion and has responded to the claims raised in the Motion to Amend.  To ensure that all of Shores's claims receive consideration, and in the absence of opposition to Shores's amended claims, this Report and Recommendation also considers the claims raised in the Motion to Amend.  (*See* Doc. 151, 158.)  Therefore, the Court GRANTS Shores's Motion to Amend.  (Doc. 138.)

conviction and sentence.  (Docs. 121, 138.)  The government opposes Shores's § 2255 Motion.
(Doc. 158.)

For the reasons stated below, I recommend that Shores's § 2255 Motion (Docs. 121, 138)
be DENIED without a hearing.

**Factual and Procedural Background**

**I.    State and Federal Criminal Investigations**

In May 2017, local police in Burlington, Vermont began a criminal investigation into
Shores.  (PSR at 7, ¶ 24.)  During that investigation, officers supervised a confidential
informant's controlled purchase of pills containing fentanyl analogues from Shores on May 4,
2017.  (*Id.* ¶ 25.)  Following the controlled purchase, officers arrested Shores on May 5, 2017.
(*Id.* ¶ 26.)  Incident to his arrest, law enforcement recovered methamphetamine, cash, fentanyl,
and Adderall pills.  (*Id.*)

After waiving his *Miranda* rights, Shores admitted that he was a "large-scale" dealer of
various drugs, including methamphetamine, cocaine, and opiates.  (*Id.* at 8, ¶ 27.)  He further
admitted using the United States Postal Service to acquire drugs from various sources.  (*Id.*)
Shores consented to a search of his business and accompanied law enforcement during the
search.  (*Id.* ¶¶ 30, 31.)  The search yielded methamphetamine, fentanyl analogues, Xanax, and
Adderall.  (*Id.* ¶ 31.)  Later that day, officers obtained a state search warrant for the same
address, where Shores led law enforcement to a safe containing almost $50,000 in cash and
approximately 200 grams of what laboratory tests subsequently confirmed to be 98% pure
methamphetamine.  (*Id.* at 8–9, ¶ 32.)  After Shores assisted with these searches, authorities
released him from custody.  (*Id.* at 8, ¶ 30.)  Based on Shores's statements and the drugs seized
at his business, officers obtained two additional state search warrants for his residence and

vehicle. (*Id.* at 9, ¶¶ 33, 35.)  Execution of these search warrants resulted in the seizure of cocaine, Xanax, fentanyl, and $17,000 in cash. (*Id.* ¶¶ 34, 36.)  On May 31, 2017, a United States Postal Inspector in Vermont obtained a federal search warrant for several packages sent to Shores. (*Id.* at 10, ¶ 40.)  The packages contained various pills and two vacuum-sealed bags of Ketamine. (*Id.*; *see id.* at 8, ¶ 28.)

On August 18, 2017, DEA Special Agent Dave O'Neil informed the Massachusetts State Police that Shores intended to fly out of Logan Airport in Boston that afternoon. (Doc. 158-1 at 3.)  After determining that Shores had two active Massachusetts arrest warrants, State Police arrested Shores at the airport. (*Id*; PSR at 10, ¶ 41.)  Upon searching Shores's person and his luggage, Massachusetts law enforcement seized a fully loaded Glock .45 caliber magazine, methamphetamine secreted in a shaving can, approximately $15,000 in cash, and Hydrocodone. (PSR at 10, ¶ 42.)

On August 21, 2017, law enforcement obtained federal search warrants for Shores's business, residence, and vehicle in Vermont, finding a ledger, cocaine, fentanyl pills, and methamphetamine. (*Id.* at 11, ¶¶ 49–51.)  Authorities also found ammunition and an August 6, 2017 bill of sale for a .45 caliber Glock handgun. (*Id.*)  A search of Shores's sailboat resulted in the seizure of GHB, cocaine, methamphetamine, psilocybin mushroom, and a ledger that appeared to document Shores's drug transactions. (*Id.* at 12, ¶ 55.)  Finally, a search of three of Shores's rental storage units yielded additional cash and cocaine. (*Id.* at 13, ¶ 58.)

## II.    State Criminal Proceedings Before Shores's Federal Arraignment

On August 21, 2017, Shores appeared in Suffolk Superior Court in Massachusetts on charges of drug possession, possession with intent to distribute methamphetamine, and unlawful

possession of ammunition.[2] (*Id.* at 29, ¶ 113.) Also on August 21, 2017, a federal Criminal Complaint issued in the District of Vermont charging Shores with possession with intent to distribute 50 grams or more of methamphetamine on May 5, 2017. On August 31, 2017, a federal grand jury in the District of Vermont returned a two-count Indictment charging Shores with possession with intent to distribute 50 grams or more of methamphetamine on or about May 5, 2017, and possession with intent to distribute cocaine on or about August 18, 2017. (Doc. 24.) Although the August 18 date in the latter charge coincided with the date of Shores's arrest in Massachusetts, the charge pertained to conduct in Vermont. (*See id.*)

Shores retained Attorney Paul Garrity to represent him in the Massachusetts case. (Doc. 144 at 2, ¶ 3.)[3] During his representation, Attorney Garrity learned of the federal charges pending in Vermont. (*Id.* ¶ 4.) He then "discussed with Mr. Shores whether he wanted [Attorney Garrity] to represent him on his Vermont case and what [his] fee for handling that case would be." (*Id.*) Attorney Garrity also spoke with Shores's mother, who helped Shores gather funds for his federal representation. (*Id.*) As Attorney Garrity was licensed to practice only in Massachusetts and New Hampshire, he informed Shores and his mother that he would seek *pro hac vice* admission to represent Shores in the federal case in Vermont. (*Id.* at 1, 2, ¶¶ 1, 4.) However, as Shores was ultimately unable to pay the required legal fee, Attorney Garrity did not represent Shores in his federal case in Vermont. (*Id.* at 2, ¶ 4.)

On July 11, 2018, Shores was convicted of the Massachusetts charges and sentenced to a prison term of two years and one day on the drug offenses and a concurrent term of one year for

---

[2] Although these charges arose from conduct that occurred in Massachusetts, the PSR considered the facts from the Massachusetts investigation to be relevant conduct in the federal case and therefore attributed no criminal history points to the Massachusetts conviction. (PSR at 29, ¶ 113.)

[3] Attorney Garrity has filed an Affidavit addressing the claims Shores raises in his § 2255 Motion. (*See* Doc. 144.)

the ammunition offense. (PSR at 29, ¶ 113.) The next day, federal prosecutors filed an application for a writ of *habeas corpus ad prosequendum* to bring Shores to the District of Vermont for arraignment on the federal Indictment. (Doc. 43.) The U.S. Marshals Service executed the federal arrest warrant on July 31, 2018. (Doc. 45.)

## III.    Criminal Proceedings After Federal Arraignment

### A.    Pre-Plea Procedural History

On August 6, 2018, the Court appointed Attorney Heather Ross to represent Shores in his federal case. (Doc. 146 at 4, ¶ 20.)[4] Shores appeared for his federal arraignment in the District of Vermont on August 28, 2018 and was ordered detained. (Docs. 47, 50.) The Court set the pretrial motions deadline for November 26, 2018, and ordered that time from August 28, 2018 through November 26, 2018 be excluded from the Speedy Trial Act calculation. (Doc. 49.)

Attorney Ross consulted with the Assistant U.S. Attorney (AUSA) on August 29 and August 30 regarding potential resolution of Shores's case. The AUSA advised that the government "would not accept a plea on Count I to a five-year mandatory minimum." (Doc. 146 at 5, ¶ 24.) Rather, "the government intended to obtain a superseding indictment charging Mr. Shores with conspiring to distribute 50 grams or more of (pure) methamphetamine carrying a ten-year mandatory minimum sentence." (*Id.*)[5] By November 21, 2018, which was only days before the November 26, 2018 pretrial motions filing deadline, the government provided Attorney Ross "with laboratory reports supporting its allegation that Mr. Shores possessed over 50 grams of pure methamphetamine." (*Id.* at 16, ¶ 78.)

---

[4] Attorney Ross has filed an Affidavit addressing the claims Shores raises in his § 2255 Motion. (*See* Doc. 146.)

[5] The government does not dispute this account of discussions between the AUSA and defense counsel in the days following Shores's arraignment. (*See* Doc. 158 at 16.)

As further detailed below, during the pendency of his federal case Shores and the government requested and received several extensions of time and continuances.

In addition to filing a Motion to Suppress, Attorney Ross engaged in extensive plea negotiations with the government and researched whether the case should be dismissed based on violation of Shores's rights under the Speedy Trial Act and the IAD. (Doc. 146 at 8–9, ¶¶ 41–44.) The government initially offered a plea agreement to Shores requiring that he plead guilty to a two-count Information charging possession with intent to distribute 50 grams or more of methamphetamine and possession of a firearm in furtherance of a drug trafficking crime. The plea offer carried a statutory mandatory minimum sentence of fifteen years. *See* 21 U.S.C. § 841(b)(1)(A); 18 U.S.C. § 924(c). (Doc. 146 at 7, ¶ 38.) Attorney Ross continued advocating on Shores's behalf to secure a more favorable plea agreement, including a detailed memo to the government and a meeting with the AUSA and the Chief of the Criminal Division in the U.S. Attorney's Office. (*Id.* at 8, ¶¶ 42, 44.) The government offered a revised plea agreement omitting the § 924(c) firearms charge but retaining the drug charge carrying a ten-year mandatory minimum sentence. (*Id.* at 9, ¶ 45.) Attorney Ross continued to gather mitigation evidence after receiving the revised plea offer. (*Id.* ¶ 46.)

## B.    Plea and Sentencing

On August 27, 2019, a Superseding Information was filed charging Shores with conspiracy to distribute 50 grams or more of methamphetamine; fentanyl, gamma hydroxybutyric acid, and Ketamine between in or about June 2016 and in or about May 2017. The parties also filed a plea agreement containing, in pertinent part, a factual stipulation that Shores conspired to distribute over 196.2 grams of methamphetamine between June 2016 and May 2017. (Doc. 92 at 2, ¶ 4.) The agreement did not contain a stipulation as to sentence.

Shores waived indictment and pleaded guilty to the Superseding Information. (Docs. 93, 139.) As part of his plea colloquy with the Court on August 27, 2019, Shores confirmed that he was satisfied with the representation of Attorney Ross. (Doc. 158-2 at 12:8–17; 34:4–6.)

The Presentence Report determined a base offense level of 32 based on a converted drug weight of 6,035.25 kilograms. (PSR at 23, ¶ 97.) The base offense level was increased two levels based on possession of a dangerous weapon. Two additional levels were added due to Shores's use of an interactive computer service to distribute controlled substances. (*Id.* at 24, ¶ 98.)[6] He also received a two-level increase because he functioned as an organizer, leader, or manager of the drug distribution activity. (*Id.* at 25, ¶ 100.) After a three-level reduction for acceptance of responsibility, the total offense level was 35. (*Id.* at 26, ¶¶ 104–106.) A criminal history category of III and a final offense level of 35 yielded an advisory Guidelines range of 210 to 262 months, and a statutory minimum term of imprisonment of 120 months. (*Id.* at 42, ¶¶ 179, 180.)

Attorney Ross asked the Court to sentence Shores to no more than the mandatory minimum of ten years. (Doc. 107 at 1.) She also requested that the Court reduce Shores's sentence by twenty-four months to account for the time he had served in Massachusetts custody (*id.* at 2), a request that the government joined (Doc. 109). With credit for the twenty-four months in state custody, the government requested a sentence within the range of 186 to 238 months. (*Id.*) At sentencing, Judge Reiss agreed with the Sentencing Guidelines calculations in the PSR. (Doc. 140 at 54:10–55:15; PSR at 42, ¶¶ 179–180.) Judge Reiss also agreed to the parties' request for a § 5K2.23 departure to account for the twenty-four months in state custody, resulting in a Guidelines range of 186 to 238 months. (Doc. 140 at 55:16–18.)

---

[6] Shores purchased and sold drugs in virtual marketplaces online. (PSR at 23, ¶ 98.)

Considering the sentencing factors under 18 U.S.C. § 3553(a), Judge Reiss noted that "[e]ven if the Court could depart below the . . . mandatory minimum sentence . . . the Court would not do so." (Doc. 140 at 59:23–25.) Judge Reiss found that Shores "need[ed] an additional consequence for the firearms," and would "add that consequence" in the form of "the 24 months that [Shores] already served." (*Id.* at 59:25–60:3.) Judge Reiss observed that "the big question before the Court is: Is a sentence of 12 years sufficient, but not greater than necessary, for what you have done? And looking at the facts carefully and thoroughly, I agree that it is." (*Id.* at 60:4–7.) Judge Reiss concluded that "12 years . . . for drug dealing with firearms is a sufficient, but not greater than necessary, sentence." (*Id.* at 60:10–12.) Accordingly, Judge Reiss sentenced Shores to 120 months' imprisonment with credit for time served and 5 years of supervised release. (*Id.* at 60:22–24.) The Court entered judgment on January 22, 2020. (Doc. 112.)

Shores did not appeal his conviction or sentence. He filed his § 2255 Motion on January 22, 2021 and the Amended Motion on July 19, 2021. (Docs. 121, 138.) The Court requested affidavits from Attorneys Garrity and Ross, after which Shores and the government submitted briefs on the relevant issues.

## IV. Shores's Motion Under 28 U.S.C. § 2255

Shores appears to raise the following challenges in his § 2255 Motion as amended. He first contends that Attorneys Garrity and Ross rendered ineffective assistance of counsel by not obtaining a plea resolution to the initial Indictment, which carried a statutory mandatory minimum sentence of five years. He further contends that the alleged ineffective assistance resulted in prejudice because he ultimately pleaded to a charge requiring a minimum ten-year sentence. (Doc. 121 at 9–13.) Second, Shores claims that his counsel were ineffective because

their conduct in his case resulted in violations of his rights under the Speedy Trial Act and the IAD. (*Id.* at 13–19.) Finally, Shores asserts that "the state and federal authorities, including the [MA] state trial judge, conspired against [Shores] to deprive him of his 8th Amendment right to reasonable bail as well as due process, speedy trial and possible double jeopardy." (Doc. 138 at 2.)[7]

Shores asserts that his "plea agreement and conviction are void" (Doc. 121 at 20), and requests that the Court "dismiss the federal case against [him] with prejudice." (Doc. 138 at 8.)

## **Discussion**

A person in federal custody may seek to correct that sentence under 28 U.S.C. § 2255(a) if (1) "the sentence was imposed in violation of the Constitution or laws of the United States," (2) "the court was without jurisdiction to impose such sentence," (3) "the sentence was in excess of the maximum authorized by law," or (4) the sentence "is otherwise subject to collateral attack." Generally, "the scope of review on a § 2255 motion should be narrowly limited in order

---

[7] Shores explains in his reply brief that he is in fact *not* asserting such a claim. (*See* Doc. 162 at 11 (stating that it is "not accurate" to interpret Shores's Motion to raise a claim that state and federal authorities conspired to deprive him of reasonable bail, due process, speedy trial, and double jeopardy).) Therefore, this Report and Recommendation does not address this potential claim.

Shores also appears to raise an access-to-the-courts claim in his reply brief. (*Id.* at 10.) He specifically contends that the alleged "delay of getting [him] to Vermont to answer these federal charges can be construed as a denial of his access to the courts." (*Id.*) However, other than citation to caselaw generally recognizing the right of prisoners to assistance from prison authorities with the preparation and filing of legal papers in court, he provides no legal authority for the claim that a claimed denial of speedy-trial rights amounts to an actionable access-to-court claim. In any event, this Report and Recommendation does not address a claim raised for the first time in a reply brief. *See Mercado v. Lempke*, No. 07 Civ. 9865(VB)(PED), 2011 WL 5223604, at *12 n.21 (S.D.N.Y. July 25, 2011) ("It is well-settled within this Circuit that a party may not raise an argument for the first time in a reply brief, including claims raised in support of a [habeas] petition.").

Finally, Shores makes an unsubstantiated claim that federal law enforcement visited him in jail "and essentially admitted they were going to drag out the [Massachusetts] proceedings to ensure he spent as much time in prison as possible by delaying his transfer to Vermont." (Doc. 162 at 12.) He further suggests that the federal prosecutor was complicit in this alleged effort to intentionally prolong his time in custody. (*Id.*) Other than his own conclusory assertions in the reply brief, Shores has offered no objective evidence to substantiate these claims. To the contrary, the documented record of the case establishes the procedural regularity of the state and federal cases.

to preserve the finality of criminal sentences and to effect the efficient allocation of judicial resources." *Graziano v. United States*, 83 F.3d 587, 590 (2d Cir. 1996).[8]

With respect to the factual basis for a court's conclusions, 28 U.S.C. § 2255 requires a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief . . . ." 28 U.S.C. § 2255(b). Courts may exercise discretion in making this determination. *See* Rule 8(a) of the Rules Governing Section 2255 Proceedings ("If the motion is not dismissed, the judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted.")[9]

## I.    Standard of Review Governing Ineffective-Assistance-of-Counsel Claims

The Sixth Amendment guarantees criminal defendants the right to be "assisted by an attorney . . . who plays the role necessary to ensure that the trial is fair." *Strickland v. Washington*, 466 U.S. 668, 685 (1984). Critically, "the right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). A defendant alleging ineffective assistance of counsel must demonstrate that (1) "counsel's

---

[8] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

[9] The materials submitted in this case included affidavits from Attorneys Garrity and Ross and supporting contemporaneous notes, correspondence, billing records, and relevant pleadings and transcripts of proceedings in this Court. Attorney Garrity filed an Affidavit and attached exhibits on August 23, 2021. (Doc. 144.) Attorney Ross filed an Affidavit and supporting exhibits on October 22, 2021. (Doc. 146.) On January 20, 2022, the government filed its Response in Opposition to the § 2255 Motion, which contained as exhibits the report related to Shores's arrest at Logan Airport on August 18, 2017 and transcripts of the arraignment and plea on August 27, 2019 and the sentencing on January 21, 2020. (Doc. 158.) Shores requested and received additional time to respond to the government's Response. (Docs. 160, 161.) Shores filed a Reply to the government's Response on March 7, 2022. (Doc. 162.) However, Shores's filings in this case do not contain affidavits or other objective evidence that contradicts the representations contained in the attorney affidavits. Therefore, this Report and Recommendation has recommended a disposition on the § 2255 Motion without an evidentiary hearing. *See Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001) ("It was, therefore, within the district court's discretion to choose a middle road that avoided the delay, the needless expenditure of judicial resources, the burden on trial counsel and the government, and perhaps the encouragement of other prisoners to make similar baseless claims that would have resulted from a full testimonial hearing.")

performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687.

"When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687–88. The standard to which an attorney's performance should be held is that of "reasonably effective assistance." *Id.* at 687. When analyzing counsel's conduct, the defendant must identify counsel's specific acts or omissions in the context of "the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690. In its consideration of counsel's performance, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689; *see also Raysor v. United States*, 647 F.3d 491, 495 (2d Cir. 2011). The determinative question is not whether counsel "deviated from best practices or most common custom," but rather whether the "representation amounted to incompetence under prevailing professional norms." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (internal quotation marks omitted). Strategic choices "made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91.

Even if counsel's conduct was professionally unreasonable, the defendant must also show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome," and it "requires a substantial, not just conceivable, likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011)

(internal quotation marks omitted) (citing *Richter*, 562 U.S. at 112).  In the context of guilty

pleas, actual prejudice means demonstrating "a reasonable probability that were it not for

counsel's errors, [the petitioner] would not have pled guilty and would have proceeded to trial."

*United States v. Arteca*, 411 F.3d 315, 320 (2d Cir. 2005) (citing *Hill v. Lockhart*, 474 U.S. 52,

59 (1985)).  Similarly, in the context of sentencing, "the defendant must show a reasonable

probability that, but for counsel's substandard performance, he would have received a less severe

sentence."  *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013).  The Second Circuit

"requires some objective evidence other than defendant's assertions to establish prejudice."

*Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003); *see also Fardella v. United States*,

Nos. 13CIV5373–LTS, 11CR872–LTS, 2014 WL 3294876, at *3 (S.D.N.Y. July 8, 2014) ("In

light of [the attorney's] sworn affidavit, the Court finds [petitioner's] self-serving, conclusory

allegation insufficient to establish a plausible claim of ineffective assistance of counsel."); *Eber-*

*Schmid v. Cuomo*, Nos. 09 Civ. 8036(BSJ)(AJP), 09 Civ. 8038(BSJ)(AJP), 2010 WL 1640905,

at *28 (S.D.N.Y. Apr. 22, 2010) (collecting cases holding that "self-serving allegations of

ineffective assistance of counsel are not enough to overturn a knowing and voluntary guilty

plea"), *report and recommendation adopted*, 2012 WL 3105012 (July 31, 2012).

### A.    Shores has not demonstrated that Attorney Garrity provided ineffective assistance of counsel.

As an initial matter, Attorney Garrity could not have provided Shores with ineffective

assistance of counsel because he did not represent Shores in his federal case.  Attorney Garrity

advised both Shores and his mother that he was not licensed to practice in Vermont and could

not represent Shores without appearing pro hac vice with local counsel.  (Doc. 144 at 2, ¶ 4; Doc.

144-3 at 2.)  Shores was unable to pay Attorney Garrity's fee.  (Doc. 144 at 2, ¶ 4; *see* Doc 144-1

at 7 (informing federal prosecutor on March 13, 2018 that he did not yet "know for sure" if he

12

would be representing Shores in Vermont, as Shores's mother was still "trying to put together funds to retain [Attorney Garrity]").)  Accordingly, Attorney Garrity did not file a pro hac vice motion in the District of Vermont, and he "did not represent [Shores] on his Vermont case." (Doc. 144 at 2, ¶ 4.)

Shores nevertheless claims that he and Attorney Garrity had a "mutual understanding" that he represented Shores in his federal case initially, which he contends explains why Attorney Garrity sent emails to the federal prosecutor in Vermont.  (Doc. 162 at 3.)  However, the correspondence attached to Attorney Garrity's affidavit undermines Shores's claim.  Attorney Garrity explains that he and the federal prosecutor exchanged emails "in relation to properly advising Mr. Shores on his Massachusetts case and consequences of steps he may take in the Massachusetts case."  (Doc. 144 at 3, ¶ 6.)  For example, Attorney Garrity asked the AUSA in November 2017 to provide an estimate of Shores's potential sentencing guidelines range in the event of conviction.  (Doc. 144-1 at 5.)  These guidelines inquiries pertained to Attorney Garrity's decision-making in Shores's state case.  (*See id.* at 8 ("I was also wondering whether [Shores] would get criminal history points on the federal case by way of working out a deal on his state case first[.]"); Doc. 144-3 at 7 (informing Shores's mother that he "doesn't have a lawyer in Vermont to negotiate with [the] [U.S.] attorney," and he is "[w]orking out a deal here that doesn't impact [Shores] on his federal charges").)  Although Attorney Garrity asked the federal prosecutor in June 2018 when Mr. Shores would "be moved into federal custody" after his sentencing in Massachusetts (Doc 144-1 at 9), his inquiry does not establish that Attorney Garrity intended to represent Shores in the federal case, particularly in light of the fact that Shores was unable to pay the required legal fees and Attorney Garrity explicitly informed Shores's mother that her son was unrepresented in the Vermont case.

Moreover, Shores cannot demonstrate that Attorney Garrity was ineffective for purportedly failing to pursue a plea to the five-year mandatory minimum charge in the initial Indictment during the pendency of the Massachusetts case. As Attorney Garrity emphasizes, because he "did not represent Mr. Shores in Vermont," he was not "in a position, without first reviewing the federal discovery materials, to effectively advise Mr. Shores on whether to plead guilty." (Doc. 144 at 4, ¶ 7.) Even assuming that Attorney Garrity was ever in a position to advise Shores on the Vermont federal case, his reluctance to recommend a plea without first reviewing the relevant discovery was objectively reasonable. Although Shores emphasizes that a plea earlier in his case could have subjected him to a mandatory minimum of five years instead of ten years, Attorney Garrity would have been professionally obligated to assess the evidence in the case—including but not limited to whether the drug evidence should be suppressed—before counseling Shores to plead guilty rather than pursue suppression litigation and trial.

More importantly, Attorney Garrity attests that he was not aware of any plea offer from the government or of Shores's desire to request one:

> There was no indication in this correspondence [with the federal prosecutor of] extending a plea offer of 5[ ] years if Mr. Shores entered a guilty plea at that time[,] nor do I have any recollection of receiving such an offer at any time or documentation in my possession of such an offer being extended at any time. I also have no recollection of Mr. Shores informing me, either orally or in writing, that he wanted to invoke his right to speedy trial and plead guilty to a 5-year mandatory minimum sentenc[e].

(*Id.* at 3–4, ¶ 7.) As Attorney Garrity's sworn statements on these issues are credible, and Shores has not presented other objective contradictory evidence, there is no basis to conclude that Attorney Garrity provided objectively unreasonable assistance to Shores.

**B.    Shores has not demonstrated that Attorney Ross provided ineffective assistance of counsel.**

Attorney Ross attests that she engaged the government in case resolution discussions within a day of Shores's initial appearance and arraignment in federal court on August 28, 2018. (Doc. 146 at 5, ¶ 24.)  At that time, the government advised that it would not accept a plea to the five-year mandatory minimum charge in the existing Indictment and intended to seek a Superseding Indictment charging Shores with the ten-year mandatory minimum.  (*Id.*)  In September and November 2018, the government disclosed to Attorney Ross several laboratory reports documenting that the methamphetamine attributed to Shores was highly pure and its quantity triggered the ten-year minimum penalty for 50 grams or more under 21 U.S.C. § 841(b)(1)(A).  (*Id.* ¶¶ 26–27.)  Upon receipt of this information—which was highly relevant to Shores's potential sentencing exposure in the event of conviction—Attorney Ross's affidavit and billing records demonstrate that she conferred with Shores about this evidence, the implications of continuing the November 26, 2018 motions deadline, and the merits of a motion to suppress. (*Id.* at 6, ¶¶ 30–32.)  Shores agreed to extend the deadline and to have Attorney Ross file a motion to suppress.  (*Id.* ¶ 33.)  Attorney Ross explains the strategic basis for doing so: "We both agreed that Mr. Shores' best chance of avoiding a superseding indictment was to suppress his May 2017 statements and the methamphetamine subsequently seized by law enforcement."  (*Id.*)

Two months later in January 2019, the government extended an offer that required Shores to plead to both the ten-year mandatory minimum charge under 21 U.S.C. § 841(b)(1)(A) and a § 924(c) charge, carrying a mandatory minimum penalty of five years consecutive to any other term of imprisonment.  *See* 18 U.S.C. § 924(c)(1)(D)(ii).  In other words, the plea offer required a combined mandatory minimum sentence of fifteen years.  (Doc. 146 at 7, ¶ 38.)  The Ross Affidavit and supporting exhibits document extensive legal research and advocacy on Shores's

15

behalf.  (*Id*. at 7–10 (detailing over a period of months Attorney Ross's efforts, including drafting a legal memo to the prosecutor, completing a motion to suppress, researching arguments for outright dismissal of the case, gathering "extensive mitigation evidence," and reviewing continuing discovery productions from the government).)  The government's brief in this habeas litigation confirms that Attorney Ross's advocacy—both in negotiations with the AUSA and in suppression litigation—resulted in the government withdrawing the offer to a fifteen-year mandatory minimum and extending an offer to the ten-year mandatory minimum:

> [Attorney] Ross . . . engaged in extensive advocacy, including through plea negotiations and suppression litigation, in her effort to obtain a less than ten-year sentence for Shores.  For a significant period, the only plea offer from the government was to a combined 15-year mandatory minimum sentence.  Ross, through her advocacy, was able to bring the government to extend a plea with only a ten-year mandatory minimum.

(Doc. 158 at 22 (citation omitted).)  Attorney Ross's advocacy was more than adequate under prevailing professional norms.  *See Harrington*, 562 U.S. at 105.

Nor can Shores show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  The indictment containing a five-year mandatory minimum charge encompassed only the methamphetamine that Shores possessed on May 5, 2017.  (Doc. 24.)  As described above, law enforcement subsequently seized additional quantities of controlled substances for which Shores could have been charged.  Additionally, even had he pleaded to the five-year mandatory minimum drug charge in the Indictment, the government could have charged him with possession of a firearm in furtherance of a drug trafficking crime, requiring a consecutive

sentence of five years.[10]  Therefore, Shores would very likely have been subject to at least ten

years' imprisonment even if he had pleaded guilty at arraignment as he claims.

Finally, even if Shores had pleaded guilty early in his case to the five-year mandatory

minimum charge under 21 U.S.C. § 841(b)(1)(B), his Guidelines range would have been well in

excess of five years after application of the relevant conduct provisions and specific offense

characteristics under the Guidelines.  In fact, at sentencing the Court determined that the

Guidelines range was 210 to 262 months (before application of the §5K2.23 departure to account

for Shores's time in state custody).  (PSR at 42, ¶ 180; Doc. 146-11 at 4.)  Shores's elevated

placement on the Guidelines table resulted from (1) the substantial drug quantity[11] (which the

PSR described as "extremely conservative"); (2) the possession of a dangerous weapon; (3) the

use of a means of mass marketing, i.e., computer, in connection with the distribution activity;

and (4) Shores's role as an organizer or leader in the offense conduct.  The Court would have

considered these same factors at sentencing even if Shores had pleaded guilty to the initial

indictment.

Judge Reiss explained that "this is a significant crime that requires a significant

sentence."  (Doc. 140 at 58:7–8.)  The Court further expressed its agreement that the ten-year

mandatory minimum appropriately reflected the gravity of the offense.  (*Id*. at 58:8–10.)  Judge

Reiss stated that, even if authorized to do so, she would not sentence Shores to less than ten

years.  In fact, the Court opined that an "additional consequence for the firearms" was warranted

(*id*. at 59:23–60:3), and determined that the two years he had already served were an adequate

---

[10]  The likelihood of a subsequent § 924(c) charge does not appear speculative given that the government's
January 2019 plea offer required that Shores plead to a § 924(c) charge.  Further, at sentencing the Court applied the
two-level enhancement for possession of a dangerous weapon.  (Doc. 158-3 at 55:22–24); *see* USSG § 2D1.1(b)(1).

[11]  As Judge Reiss observed, Shores was "certainly the biggest meth distributor" the Court had encountered
in ten years.  (Doc. 140 at 52:15–16.)

additional consequence.  Under these circumstances, Shores cannot show that "the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed."  *See Lafler v. Cooper*, 566 U.S. 156, 164 (2012).

**C.    Ineffective-Assistance-of-Counsel Claims Based on the Right to a Speedy Trial**

Shores contends that both of his attorneys provided ineffective assistance when they did not raise claims under the Speedy Trial Act, the IAD, and the Sixth Amendment.  (Doc. 121 at 17–18; Doc. 138 at 3.)  He asserts that their alleged failure to raise or otherwise address these claims resulted in a longer sentence than he should have received.  (Doc. 121 at 17.)  As these claims lack legal merit, Shores's counsel were not ineffective by not raising them.

**1.    Shores's federal statutory speedy-trial rights were not violated during the pendency of his prosecution in Massachusetts.**

Under the Speedy Trial Act, "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges."  18 U.S.C. § 3161(b).  Thereafter, "[i]n any case in which a plea of not guilty is entered, the trial of a defendant . . . shall commence within seventy days from the filing date . . . of the information or indictment, or from the date the defendant has appeared before a judicial officer . . . , whichever date last occurs."  *Id.* § 3161(c)(1).  "[A]n individual is not arrested under [§] 3161(b) until he is taken into custody after a federal arrest for the purpose of responding to a federal charge." *United States v. Bloom*, 865 F.2d 485, 490 (2d Cir. 1989) (quoting *United States v. Johnson*, 815 F.2d 309, 312 (5th Cir. 1987)).  Thus, "[r]estrictions of liberty that are '*not* in connection with the filing of a complaint or for purposes of the defendant's facing federal charges . . . do *not* constitute the type of imposition that triggers the Speedy Trial Act's timing provisions.'"  *United*

*States v. Jones*, 129 F.3d 718, 721 (2d Cir. 1997) (brackets omitted) (quoting *Bloom*, 865 F.2d at 491).

Massachusetts State Police arrested Shores in Boston on August 18, 2017 based on outstanding Massachusetts state warrants.  (PSR at 10, ¶ 41.)  Shores was charged in Suffolk Superior Court with possession of controlled substances and unauthorized possession of ammunition arising out of his arrest at Logan Airport on August 18, 2017.  (PSR at 10, ¶¶ 41–44; *id.* at 29, ¶ 113.)  Shores remained in primary Massachusetts state custody from the time of his August 18, 2017 arrest until sentencing in state court on July 11, 2018.  (*Id.* at 29, ¶ 113.)  The federal Criminal Complaint was filed in the District of Vermont on August 21, 2017, and the federal grand jury returned an Indictment on August 31, 2017, but both the Complaint and the Indictment pertained to conduct that occurred in Vermont, not Massachusetts.  (*See* Doc. 24 (indictment charging criminal conduct that occurred "in the District of Vermont").)  On July 11, 2018, Shores pleaded guilty to the Massachusetts charges and received a sentence of two years and one day.  (PSR at 29, ¶ 113.)  On July 12, 2018, the federal prosecutor in Vermont filed a writ of *habeas corpus ad prosequendum*, which the Court issued on July 16, 2018.  (Doc. 43.)  Shores appeared in this Court for arraignment on the federal indictment on August 28, 2018.  (Minute Entry, ECF No. 47.)  Therefore, Shores's arrest in August 2017 based on conduct in Massachusetts did not trigger the running of the Speedy Trial Act's time limitations in the Vermont federal case.  Rather, time began to run under the Speedy Trial Act on August 28, 2018, the date he appeared for arraignment in this Court.  *See* 18 U.S.C. § 3161(c)(1) (trial must occur within seventy days from the filing date of the indictment or from the date the defendant has appeared before a judicial officer, whichever is later).

Shores acknowledges that there was no federal Criminal Complaint or federal arrest warrant pending at the time of his arrest in Massachusetts in August 2017. Nevertheless, he contends that the Massachusetts arrest involved the participation of DEA agents and therefore was "directly related to th[e] federal investigation" and "was a federal arrest in all but name." (Doc. 162 at 6–7.) Therefore, Shores argues that the August 2017 arrest "triggered his Speedy Trial Act rights." (*Id*. at 6.) However, the Second Circuit has not held that the Speedy Trial Act is triggered where there is "agreement between federal and state authorities to cooperate in the investigation and prosecution . . . and the resultant pooling of resources and manpower, evidenced by the presence of federal agents at . . . state arrests." *United States v. Mejias*, 552 F.2d 435, 441 (2d Cir. 1977). As *Mejias* explained, to hold otherwise would require the "rejection of the doctrine of dual sovereignty," which "recognizes that the federal government is not bound by the actions of state authorities and that successive state and federal prosecutions are constitutionally permissible." *Id*. at 441–42.[12] *Mejias* refused to attribute any delay in state proceedings to the federal government, "particularly where the federal government specifically agreed not to arrest [the defendants] in the first instance, and the arrests were made by and under the auspices of state authorities with [defendants] arraigned on state charges." *Id*. at 442.

---

[12] Shores contends that the dual-sovereignty doctrine should have no application in this case because federal authorities so "dominate[d]" and "manipulate[d] the prosecutorial machinery" of Massachusetts that the successive state and federal prosecutions in this case should be deemed constitutionally impermissible. (Doc. 138 at 4–5.) Shores is correct that there is an exception to the dual-sovereignty doctrine in circumstances where the state functions as a mere "tool" of the federal government, or where the facts demonstrate that one prosecution is a "sham and a cover" for another. *Bartkus v. Illinois*, 359 U.S. 121, 123–24 (1959). However, the exception does not apply simply because state and federal authorities cooperate with one another. Rather, it must be shown that the "state and federal prosecutions are so intertwined as to undermine the assumption that two supposedly independent criminal actions were prosecuted by separate sovereigns." *United States v. Coonan*, 938 F.2d 1553, 1563 (2d Cir. 1991). Shores has not made such a showing here. He offers a series of speculative claims to explain the state and federal procedural history of his prosecutions, ultimately concluding that there was "clear collusion" between state and federal authorities. (Doc. 138 at 6.) The record establishes that each prosecution pertained to separate offenses occurring in separate jurisdictions. Shores has provided no objective evidence to suggest otherwise.

Shores's concurrent state and federal prosecutions did not run afoul of the Speedy Trial
Act.  He was arrested in August 2017 on Massachusetts warrants.  His criminal case in
Massachusetts state court was based on the controlled substances and ammunition recovered at
Logan Airport upon arrest.  Shores's arrest and prosecution in Massachusetts were clearly under
the "auspices of state authorities."  *Id.*  The prompt filing of federal charges in Vermont—the
Complaint on August 21, 2017 and the Indictment on August 31, 2017—further belies any claim
of "intentional abuse" of the Speedy Trial Act.  *See Jones*, 129 F.3d at 724.  Thus, Shores
suffered no violation of his Speedy Trial Act rights arising from his state and federal
prosecutions.

Shores cites *Gravitt v. United States*, 523 F.2d 1211 (5th Cir. 1975) for the proposition
that his federal speedy-trial rights attached at the time of his August 2017 arrest in
Massachusetts.  (Doc. 162 at 7–8.)  He specifically points to the following language in *Gravitt*:

> [Gravitt's] right to a speedy trial in fact attached prior to the return of the first
> [federal] indictment, when he was in state custody, federal authorities knew where
> to locate him, a formal complaint was filed, and an arrest warrant issued.  It is from
> this point in time that the delay must be computed.

*Gravitt*, 523 F.2d at 1215 (footnote and citation omitted).  Shores's reliance on *Gravitt* is
misplaced.

Gravitt was arrested on May 15, 1971 in Florida based on an arrest warrant issued in
Georgia for armed robbery.  During his arrest, Florida police recovered several firearms and
assorted bomb-making material.  ATF Agents in Florida questioned Gravitt on May 16, 1971,
and a federal Criminal Complaint and arrest warrant issued on May 21, 1971.  Gravitt was
removed to Georgia a short time later, "ostensibly for trial on the state charges which led to his
May 15, 1971 arrest."  *Id*. at 1213.  Critically, it was unclear to the Fifth Circuit whether any
proceedings had occurred in Georgia state court in the eleven months that elapsed between

21

Gravitt's removal to Georgia in May 1971 and the return of the federal indictment in Florida on April 14, 1972.[13]  *Id*. at 1216 ("The failure to inquire into the existence of substantial actual prejudice during the long period preceding reindictment requires remand for an evidentiary hearing.").

In remanding the case for further inquiry into whether the defendant had been prejudiced by the delay, *Gravitt* instructed the district court to "examine the circumstances of [Gravitt's] detention, including whether he underwent a trial in Georgia, and, if so, the time consumed in trial proceedings."  *Id*.  The court expressly noted that "if [Gravitt] was in fact being held for trial in Georgia, delay prior to his reasonable availability is not counted."  *Id*. (internal quotation marks omitted).

Pertinent to Shores's claim that his federal speedy-trial rights attached at the time of his August 2017 arrest in Massachusetts, the Fifth Circuit explained:

> [The speedy trial] right did not attach, contrary to appellant's contention, on the date of arrest.  Gravitt was arrested on charges stemming from violations of Georgia state law, not on charges stemming from the federal firearms conviction which he now challenges.  For purposes of determining when the right to speedy trial attaches, the *[b]asis* [f]or arrest is critical.

*Id*. at 1215 n.6 (emphsais added).  Similarly, Shores was arrested on Massachusetts warrants in August 2017 and subsequently charged under Massachusetts law for offenses that occurred in Massachusetts.  His speedy-trial rights for federal purposes did not attach at the time of arrest.  Further, as Shores remained in state custody pending resolution of his case in July 2018, under *Gravitt* the time he remained in Massachusetts custody before he was transferred to Vermont would not count in the prejudice analysis.  *Id*. at 1216.

---

[13]  The indictment was dismissed on June 8, 1972 upon the government's motion and a superseding indictment was returned on August 9, 1972.  *Gravitt*, 523 F.2d at 1213–14.

### 2.    Shores's rights under the IAD were not violated.

Shores contends that Attorney Garrity was ineffective because he purportedly did not act on Shores's request to be transferred from Massachusetts state custody to federal custody under the IAD.  *See* 18 U.S.C. Appendix 2.  According to Shores, "if counsel Garrity had complied with the defendant's request to initiate a transfer via the [IAD] shortly after his federal indictment . . . the government would have had to bring him to trial within 180 days of Massachusetts receiving the request."  (Doc. 138 at 3.)  This claim is without merit.

The IAD is "a compact entered into by 48 states, the United States, and the District of Columbia to establish procedures for resol[ving] . . . one State's outstanding charges against a prisoner of another State."  *New York v. Hill*, 528 U.S. 110, 111 (2000); *see Adams v. United States*, 423 F. Supp. 578, 579 (E.D.N.Y. 1976) (noting the IAD is "intended to prescribe a uniform procedure to secure the presence of prisoners incarcerated in other jurisdictions"), *aff'd*, 559 F.2d 1202 (2d Cir. 1977).  Given the Agreement's stated purpose of "encourag[ing] the expeditious and orderly disposition of . . . charges [outstanding against a prisoner] and determin[ing] . . . the proper status of any and all detainers based on untried indictments, informations, or complaints," 18 U.S.C. § app. 2 § 2, the Agreement "prescribes procedures by which [a] prisoner may demand the speedy disposition of certain charges pending against him in another jurisdiction."  *United States v. Mauro*, 436 U.S. 340, 343 (1978); *State v. Crawford*, 169 Vt. 371, 373, 737 A.2d 366, 367 (1999) ("The IAD sets forth procedures for the prompt disposition of criminal charges filed in one state against a prisoner in another state.").  The IAD is also intended "to prevent excessive interference with a prisoner's rehabilitation" and "to help alleviate the uncertainty and anxiety of prisoners resulting from pending criminal cases," because such uncertainty and anxiety "ha[s] a detrimental effect upon prisoner rehabilitation."  *Adams*,

423 F. Supp. at 579; *see United States v. Woods*, 775 F.2d 1059, 1060 (9th Cir. 1985) ("Article IV(e) is intended to prevent prisoners from being shuttled back and forth between institutions, a practice which is disruptive of rehabilitation and may work a denial of privileges earned at one institution." (citing *United States v. Roy*, 771 F.2d 54, 57 (2d Cir. 1985)). "As a congressionally sanctioned interstate compact within the Compact Clause of the United States Constitution, Art. I, § 10, cl. 3, the IAD is a federal law subject to federal construction." *Hill*, 528 U.S. at 111 (internal quotation marks omitted).

Article III(a) "provides a procedure by which a prisoner against whom a detainer has been filed can demand a speedy disposition of the charges giving rise to the detainer," and Article IV "provides the means by which a prosecutor who has lodged a detainer against a prisoner in another State can secure the prisoner's presence for disposition of the outstanding charges." *Mauro*, 436 U.S. at 351. A "detainer" is a request made by the criminal justice agency of a state that is seeking to bring charges against a prisoner who is in another state's custody, directed to the institution in which the prisoner is housed, to hold the prisoner for the charging state's agency or notify the agency when the prisoner's release is imminent. *Hill*, 528 U.S. at 112 (citing *Fex v. Michigan*, 507 U.S. 43, 44 (1993)). The Supreme Court has explained the procedure that results from the filing of a detainer under the IAD:

> After a detainer has been lodged against him, a prisoner may file a request for a final disposition to be made of the indictment, information, or complaint. Upon such a request, the prisoner shall be brought to trial within [180] days, provided that for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance. Resolution of the charges can also be triggered by the charging jurisdiction, which may request temporary custody of the prisoner for that purpose. In such a case, trial shall be commenced within [120] days of the arrival of the prisoner in the receiving state, subject again to continuances for good cause shown in open court. If a defendant is not brought to trial within the applicable statutory period, the IAD requires that the indictment be dismissed with prejudice.

*Id.* at 112 (citations and internal quotation marks omitted); *see Alabama v. Bozeman*, 533 U.S. 146, 151 (2001) ("[I]t is important to keep in mind that the [IAD] basically (1) gives a prisoner the right to demand a trial within 180 days; and (2) gives a State the right to obtain a prisoner for purposes of trial, in which case the State (a) must try the prisoner within 120 days of his arrival, and (b) must not return the prisoner to his 'original place of imprisonment' prior to that trial.").

First, by its express terms the IAD applies only to *sentenced* prisoners subject to untried charges. *See* IAD art. III(a) (applying its provisions to an individual who "has entered upon a term of imprisonment in a penal or correctional institution of a party State"); *Kiendra v. Hadden*, 763 F.2d 69, 71 (2d Cir. 1985); *United States v. Evans*, 423 F. Supp. 528, 531 (S.D.N.Y. 1976). Shores was not sentenced in Massachusetts until July 11, 2018. (PSR at 29 ¶ 113.) Therefore, the IAD's protections were not available to Shores when he claims that he requested transfer "shortly after the federal indictment" on August 31, 2017. *See Taylor v. United States*, No. CR-02-0097 (CPS), 2007 WL 9782845, at *4 (E.D.N.Y. Jan. 11, 2007) (explaining that the IAD applies only to prisoners actually serving their sentences, not pretrial detainees). Upon sentencing in Massachusetts, a writ issued on July 16, 2018 to bring Shores to federal court in Vermont just days after the sentencing. He appeared in federal court on August 28, 2018. As explained below, Speedy Trial Act exclusions applied throughout the pendency of his federal case. These tolled time periods under the Speedy Trial Act similarly tolled the applicable time periods under the IAD. *See* IAD art. VI(a) ("In determining the duration and expiration dates of the time periods provided in articles III and IV . . . the running of said time periods shall be tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter."); *United States v. Scheer*, 729 F.2d 164, 168 (2d Cir. 1984).

Second, to the extent that Shores might be claiming that his transfer to Vermont violated the anti-shuttling provisions of the IAD, this claim is also without merit. Under article III of the IAD, "[i]f trial is not had on any indictment . . . prior to the return of the prisoner to the original place of imprisonment, such indictment . . . shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice." IAD art. III(d). After his July 11, 2018 sentencing, Shores appeared for arraignment on the federal indictment in Vermont on August 28, 2018 and remained in federal custody for the duration of the federal case, including plea and sentencing. As noted, speedy-trial exclusions applied throughout the pendency of the federal case. Therefore, his prosecution did not violate either the timing provisions or the anti-shuttling provisions of the IAD.

### 3. Shores's statutory speedy-trial rights were not violated after he came into federal custody.

Similarly, Shores's federal prosecution in Vermont did not run afoul of the Speedy Trial Act. Time was repeatedly excluded from the Speedy Trial Act over the course of his case. With respect to Shores's claim that he did not consent to the exclusions of time from the Speedy Trial Act related to the continuances, Attorney Ross attests: "As I am duty bound under the Speedy Trial Act and the rules of this Court, I obtained Mr. Shores' informed consent before consenting on his behalf to exclude time from the Speedy Trial Act clock." (Doc. 146 at 17, ¶ 83.) Attorney Ross's contemporaneous billing records further substantiate the representation in the Affidavit that Shores consented to the continuances and the exclusion of time under the Speedy Trial Act.

Specifically, the docket reveals that motions were filed and Speedy Trial Act exclusions obtained on November 26, 2018, January 30, 2019, and July 10, 2019. (Docs. 51, 55, 83.) Attorney Ross's billing entries at the time of these requests record conversations with Shores regarding each of these motions. (Doc. 146-13 at 3, 9 (entries on November 21, 2018, January

26

24, 2019, and July 10, 2019 describing extending motions deadline on first two dates and "Speedy Trial Act clock exclusion" on the last date).)  The docket reflects that, in addition to the initial exclusion of time at arraignment, these motions resulted in the exclusion of time from August 28, 2018 to February 25, 2019.  (Docs. 51, 54, 55.)  Attorney Ross filed a Motion to Suppress on February 25, 2019.  (Doc. 58.)  After Shores filed his Motion, the parties agreed three times to extend the time to file their respective responses or replies.  (Docs. 60, 70, 74.)  Briefing on the Motion to Suppress was completed on May 6, 2019.  (Doc. 77.)  Judge Reiss held a hearing on the Motion to Suppress on May 10, 2019 (Minute Entry, ECF No. 78) and issued an Opinion and Order denying the Motion on June 11, 2019.  (Doc. 81.)  The proceedings associated with the suppression litigation also tolled the time limitations under the Speedy Trial Act.  *See* 18 U.S.C. § 3161(h)(1)(D) (excluding the period of delay "resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion"); § 3161(h)(1)(H) (excluding the period of delay "reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court").

The Court set the case for a pretrial conference or change-of-plea hearing on July 16, 2019.  (Doc. 82.)  On July 10, 2019, the parties filed a joint motion to continue excluding time under the Speedy Trial Act until August 16, 2019.  (Doc. 83.)  The Court granted each of these requests.  (Docs. 53, 57, 63 (text-only order), 71 (text-only order), 76, 84.)  Shores pleaded guilty on August 27, 2019, which stopped the speedy-trial clock.

As a result of these exclusions, the parties never reached either the Speedy Trial Act's seventy-day limit or the time limits under the IAD.  *See Roy*, 771 F.2d at 59 ("Article VI(a) of the [Interstate] Agreement [on Detainers] provides that the running of the 120-day time period

'shall be tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter.' We have interpreted this language to 'exclude all those periods of delay occasioned by the defendant.'" (quoting *United States v. Scheer*, 729 F.2d 164, 168 (2d Cir. 1984))).

Therefore, the course of proceedings in Shores's federal prosecution did not violate his rights under the Speedy Trial Act.

### 4.    Shores's prosecution did not violate his right to a speedy trial under the Sixth Amendment.

In addition to his statutory Speedy Trial Act claim, Shores also asserts a constitutional speedy-trial claim under the Sixth Amendment. (Doc. 121 at 14–18 (analyzing the factors applicable to a Sixth Amendment speedy-trial claim).) As Shores did not raise this claim as part of a direct appeal, he is barred from raising the claim on habeas review. *Massaro v. United States*, 538 U.S. 500, 504 (2003) (claims not raised on direct appeal "may not be raised on collateral review unless the petitioner shows cause and prejudice" or that he is actually innocent). Nevertheless, the claim is without merit.

"In all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. Const. amend. VI. The right to a speedy trial is "fundamental to our system of justice." *United States v. Black*, 918 F.3d 243, 253 (2d Cir. 2019) (internal quotation marks omitted). The constitutional right to a speedy trial is triggered "by arrest, indictment, or other official accusation." *Doggett v. United States*, 505 U.S. 647, 655 (1992). The Second Circuit has explained that "courts are required to count the time between a defendant's arrest and the filing of an indictment in the duration of the relevant speedy trial time period." *Black*, 918 F.3d at 258.

Courts apply four factors in the evaluation of a speedy-trial claim under the Sixth Amendment: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's

assertion of his right to a speedy trial; and (4) the prejudice to the defendant caused by the delay. *Barker v. Wingo*, 407 U.S. 514, 530 (1972). These factors "must be considered together with such other circumstances as may be relevant," and individually "have no talismanic qualities." *Id.* at 533.

The first *Barker* factor, the length of the delay, "'is to some extent a triggering mechanism'; only if the delay is substantial are the other factors brought into play." *Rayborn v. Scully*, 858 F.2d 84, 89 (2d Cir. 1988) (quoting *Barker*, 407 U.S. at 530). "[B]y definition, [a defendant] cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness." *Doggett*, 505 U.S. at 652. In this case, the length of delay from indictment to arraignment was approximately one year, and the delay from arraignment to plea was approximately one year, falling generally within the range that the Second Circuit has considered reasonable. *See, e.g.*, *United States v. McGrath*, 622 F.2d 36, 41 (2d Cir. 1980) (upholding indictment despite 24-month delay); *see also Flowers v. Warden, Conn. Corr. Inst., Somers*, 853 F.2d 131, 133 (2d Cir. 1988) (finding seventeen-month delay to be "considerably shorter" than cases with no speedy-trial violation). This factor is neutral in the analysis. *See United States v. Cain*, 671 F.3d 271, 296 (2d Cir. 2012) ("[W]hile we assume that the [22-month] delay was sufficient to trigger a speedy trial inquiry, the first *Barker* factor is largely neutral . . . .").

With respect to the second factor—reason for the delay—"delay in waiting for resolution of other criminal charges in another jurisdiction does not weigh heavily against the Government where there is no 'tactical advantage.'" *United States v. Villar*, No. 07 Cr. 639 (NRB), 2021 WL 4710800, at *4 (S.D.N.Y. Oct. 8, 2021) (quoting *Rayborn*, 858 F.2d at 91); *see also United States v. Jones*, 91 F.3d 5, 8 (2d Cir. 1996) (holding that twenty-five months elapsed between the

date of defendant's indictment and initial appearance in the charging district did not amount to actionable prosecutorial delay where prosecutors in charging district were awaiting the conclusion of criminal proceedings against the defendant in another district). In this case, the government's decision to await the conclusion of Shores's criminal case in Massachusetts, followed by its prompt application in this Court for Shores's transfer to Vermont within days of the sentencing in Massachusetts, was reasonable. Once Shores was transferred to Vermont, the docket reflects legitimate pretrial proceedings, including suppression litigation and extended plea negotiations, over the next year culminating in a guilty plea in August 2019. On these facts, the Court cannot find that the approximately two-year period between the date of the indictment and Shores's guilty plea—with one of those years attributed to state criminal proceedings in Massachusetts—was unreasonable. Therefore, this factor weighs against Shores.

With respect to the third factor, the Court considers whether the defendant asserted his right to a speedy trial. Shores states that he asserted his speedy-trial rights to Attorneys Garrity and Ross "multiple times, even to the extent of enlisting help from family to speak up on his behalf." (Doc. 121 at 17 (attaching February 15, 2019 email from Shores's brother, Travis Shores, to Attorney Ross raising Speedy Trial Act concerns (Doc. 121-4 at 1–3)).) Although "a defendant's failure to formally raise the right via motion does not necessarily count against the defendant," *United States v. Tigano*, 880 F.3d 602, 617 (2d Cir. 2018), "a defendant's assertion of his own right to a speedy trial—even though ignored or contravened by his counsel—is the relevant fact for purposes of Sixth Amendment analysis, *id*. at 618. The issue is determined "on an 'ad hoc basis' considering the facts of each case." *Id*. (quoting *Barker*, 407 U.S. at 530).

In this case, the record does not reflect that Shores asserted his speedy-trial rights in court before he pleaded guilty. Further, notwithstanding his claim that he repeatedly asserted his

speedy-trial rights to counsel, the sworn affidavits of Attorneys Garrity and Ross are squarely to the contrary. Attorney Garrity attests that "at no time was I asked by Mr. Shores during my representation of him to assert a Speedy Trial Act claim." (Doc. 144 at 4, ¶ 8.) Attorney Ross describes multiple occasions during his case when she advised her client of his speedy-trial rights. (*See* Doc. 146 at 4, ¶ 22 (explaining his speedy-trial rights in a meeting prior to the August 2018 federal arraignment); *id.* at 6–7, ¶¶ 28, 30, 32–34 (after receipt of laboratory reports days before the pretrial motions deadline in November 2018, Attorney Ross explained to Shores his speedy-trial rights and obtained his consent to extend the pretrial motions deadline and exclude the additional time from the Speedy Trial Act calculation); *id.* at 7–8, ¶ 39 (upon receipt of a government plea offer shortly before the January 2019 pretrial motions deadline, Attorney Ross reiterated to Shores his speedy-trial rights and obtained his consent to extend the motions deadline and exclude the time to permit counsel to continue negotiations with the government, prepare a motion to suppress, and retain a forensic psychologist); *id.* at 8, ¶ 41 (in February/March 2019, Attorney Ross researching "other avenues for dismissal," including whether Shores's rights "under the Interstate Agreement on Detainers and the Speedy Trial Act were violated by the government's delay in bringing him to Vermont to answer to the Indictment")[14]; *id.* at 9–10, ¶¶ 50–54 (after receiving a revised plea offer and additional "extensive discovery" from the government in June 2019, Attorney Ross again explained to Shores his speedy-trial rights, and he agreed to the exclusion of additional time under the Speedy Trial Act to allow for consideration of this additional information).) As noted previously in this

---

[14] After conducting legal research on the issues (and sharing with her client the legal research memorandum upon which she based her conclusions (Doc. 146 at 11, ¶ 57)), Attorney Ross ultimately concluded that the process the federal prosecutor followed in placing a detainer on Shores while he was in Massachusetts custody, and then seeking a writ five days after conclusion of the state case for his transfer to federal court in Vermont, "did not violate either the Interstate Agreement on Detainers or the Speedy Trial Act." (*Id.* ¶ 56.)

Report and Recommendation, contemporaneous billing records further substantiate Attorney

Ross's repeated efforts to advise Shores of his speedy-trial rights and obtain his consent to each

extension of the motions deadline and corresponding exclusion of time under the Speedy Trial

Act. This factor weighs against Shores.

      Finally, Shores is unable to demonstrate the fourth factor—prejudice caused by the delay.

"Although 'a showing of prejudice is not a prerequisite to finding a [S]ixth [A]mendment

violation, courts generally have been reluctant to find a speedy trial violation in the absence of

genuine prejudice.'" *Jones*, 129 F.3d at 724 (quoting *Rayborn*, 858 F.2d at 94). To the extent

that Shores claims that the time he spent in Massachusetts custody violated his Sixth Amendment

right to a speedy trial, he has not shown prejudice. As noted above, Judge Reiss imposed the

mandatory minimum ten-year sentence and, critically, departed downward "to reflect the 24

months that [Shores] spent in state custody," which reduced the advisory Guidelines range to

186 to 238 months. (Doc. 140 at 55:17–18.) And as discussed above, a faster pace in

proceedings would not have changed the sentence imposed. He has thus not made a

"particularized showing of prejudice." *United States v. Moreno*, 789 F.3d 72, 81 (2d Cir.

2015).[15]

---

[15] Shores asserts in his reply brief that "the most obvious prejudice" was "the unnecessary extension of his prison term because these two matters were prosecuted consecutively rather than concurrently." (Doc. 162 at 9.) He claims that if the federal and state sentencings had occurred more closely in time to one another, "the BOP would have been obligated to credit all of the time [he] spent in custody via 'Willis credits.'" (*Id.*) Under *Willis v. United States*, 438 F.2d 923, 925 (5th Cir. 1971), "time spent by a defendant in state custody as the result of action by the federal government, such as the lodging of a detainer that prevents the defendant's release on bail in his state case, could be counted against a federal sentence." *United States v. Delestre*, No. S16 94 CR.395 (MBM), 2005 WL 53268, at *3 (S.D.N.Y. Jan. 8, 2005). As an initial matter, this claim of prejudice need not be addressed as Shores has raised it for the first time in his reply brief. In addition, he has not substantiated the claim that the time he spent in Massachusetts custody was due to action by the federal government. The record reflects that Shores remained in state custody as the result of an independent state prosecution. His contention regarding time that "the BOP would have been obligated to credit" is wholly speculative. The fact remains that the Court departed downward two years from the advisory Guidelines range to account for time in Massachusetts custody, ultimately requiring that Shores serve only the ten-year minimum sentence, which was approximately five years less than the low end of the Guidelines range.

As the record does not demonstrate a violation of Shores's Sixth Amendment speedy-trial rights, his counsel were not ineffective in not asserting such a claim.  *See Strickland*, 466 U.S. at 697.

## Conclusion

For the reasons explained above, I recommend that Shores's § 2255 Motion (Docs. 121, 138) be DENIED.

Because the Motion and other files and records in this case "conclusively show that [Shores] is entitled to no relief," I also recommend that an evidentiary hearing on the Motion is not necessary.  28 U.S.C. § 2255(b).  I further recommend that the Court decline to issue a certificate of appealability because Shores has not "made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Generally, a movant meets this burden by demonstrating that "reasonable jurists could debate whether . . . the [motion] should have been resolved in a different manner or that the issues presented [a]re adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted).  Shores has not satisfied this burden.

Dated at Burlington, in the District of Vermont, this 20th day of July 2023.

*/s/ Kevin J. Doyle*
Kevin J. Doyle
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections that shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); L.R. 72(c).  Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision."  *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) (quoting *Small v. Sec'y of Health & Hum. Servs.*, 892 F.2d 15, 16 (2d Cir. 1989)).